UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOHN Q. BAMVAKAIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 4:07-CV-01149 CEJ |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

I. **Procedural History**

Plaintiff John Q. Bamvakais applied for disability benefits on January 22, 2003, under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., 1381 et seq. Plaintiff claimed disability based on chronic depression, pain disorder, asthma, and schizophrenia. (Tr. 176, 235). The application was denied, and plaintiff appealed. The Appeals Council vacated the ALJ's decision remanded the case for further consideration. (Tr. 484-85). A supplemental hearing was held on January 25, 2006, and the ALJ denied plaintiff's application on August 22, 2006. (Tr. 8-18, 42-67). The Appeals Council affirmed this denial on April 14, 2007. (Tr. 3). Accordingly, the ALJ's August 22, 2006 decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g). Plaintiff timely filed his complaint in this Court on August 1,

2007. Plaintiff proceeds in this Court represented by counsel.

## II. <u>**Evidence Before the ALJ**</u>

At the time of the supplemental hearing, plaintiff was 41 years old . (Tr. 44). He had completed school through the ninth grade and obtained his Graduate Equivalency Degree, and he lived with his parents. (Tr.44-45). He had worked in the past as an order picker, restaurant cook, and locksmith. (Tr. 47, 60-61).

At the January 25, 2006 hearing, plaintiff testified about his daily activities, his medical and psychological conditions, and the lingering psychological effects from having been stabbed in the chest in 1990. (Tr. 42-67).

A vocational expert, Gary Weimholt, also testified at the January 25, 2006 hearing. (Tr. 59-66). Mr. Weimholt described plaintiff's past work, which was unskilled, semi-skilled or medium-skilled. (Tr. 60-61). Mr. Weimholt testified that an individual with plaintiff's current exertional limitations would not be able to perform plaintiff's past work. (Tr. 61-62). Mr. Weimholt also testified that other jobs existed in the state economy that an individual with plaintiff's exertional limitations would be able to perform. (Tr. 62).

Mr. Weimholt also testified, however, that there would not be other work available for an individual with plaintiff's exertional limitations who also had several non-exertional limitations at a moderate level. (Tr. 63-64). Mr. Weimholt testified that the individual's moderate abilities to maintain attention and concentration for extended periods; to work in close proximity to

others without being distracted; to maintain socially appropriate behavior in the workplace; and to complete a normal workday or workweek without interruption from psychologically based symptoms would preclude any job, including past relevant work. (Tr. 64).

   **III.   Medical Evidence**[1]

On January 30, 2001, a urine test conducted on plaintiff registered positive for benzodiazapines and for cannabinoids (marijuana, THC screen).[2] (Tr. 156a). On January 23, 2001, plaintiff underwent surgery to remove an abcess on his right arm. (Tr. 111-135). On January 30, 2001, plaintiff was injured in a drive-by shooting that lacerated his head, but did not result in an intracranial injury. (Tr. 158). On January 31, 2001, Dr. Aqeeb Ahmad noted that plaintiff was diagnosed with dysthymic disorder, erectile dysfunction, and personality disorder NOS. (Tr. 407). Dr. Ahmad assessed plaintiff's GAF at 70.[3] (Tr. 407).

---

[1] At the January 25, 2006 hearing, the plaintiff amended the onset date of his alleged disability to April 18, 2000. Accordingly, the Court will consider only the medical evidence in the record that postdates the onset date.

[2] Benzodiazepine medications are used to treat anxiety disorders, panic attacks, and depression, agoraphobia (fear of open spaces), and premenstrual syndrome. Medline Plus, United States National Library of Medicine and the National Institutes of Health, *available at* http://www.nlm.nih.gov/medlineplus/druginformation.html (last accessed August 15, 2008).

[3] A Global Assessment Functioning score is a score on a 0-100 rating scale of psychological functioning. DSM-IV-TR at 34. A GAF score in the 61-70 range indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

On March 21, 2001, Dr. Ahmad diagnosed plaintiff with antisocial personality disorder and panic disorder.[4] (Tr. 418). His GAF score was 50.[5] (Tr. 416). In monthly appointments in April and May 2001, Dr. Ahmad did not change plaintiff's diagnosis and assigned him GAF scores of 55 and 50.[6] (Tr. 416-17).

On July 3, 2001, Dr. Ahmad noted that plaintiff had not been compliant with his medications (Wellbutrin, Xanax, and Rispedal). (Tr. 414). Plaintiff was diagnosed with psychotic disorder NOS, panic disorder, and dysthymia.[7] (Tr. 415). His GAF score was 50.

---

[4] The diagnostic criteria for antisocial personality disorder are "a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by" three or more of the following: "failure to conform to social norms with respect to lawful behaviors," "deceitfulness . . . impulsivity or failure to plan ahead . . . irritability and aggressiveness . . . reckless disregard for safety of self or others . . . consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations [and] lack of remorse." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision (American Psychiatric Association, 2000) (hereinafter DSM-IV-TR), 706.

[5] A GAF score in the 41-50 range indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

[6] A GAF score in the 51-60 range indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

[7] Psychotic disorder-not otherwise specified indicates that a patient is displaying "psychotic symptamotology (i.e. delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about

4

(Tr. 415). In an appointment on August 7, 2001, Dr. Ahmad found no change in plaintiff's diagnoses. (Tr. 413).

In September 2001, after test results indicated plaintiff had been abusing benzodiazapine, Dr. Ahmad recommended that plaintiff get case management, detoxification, and drug treatment. (Tr. 138-39). On September 5, 2001, Dr. Ahmad noted that plaintiff had been diagnosed with psychotic disorder NOS, panic disorder, antisocial personality disorder, and benzodiapine use. (Tr. 408).

On October 4, 2001, Dr. Ahmad noted that plaintiff had not been compliant with his medication (Wellbutrin and Zyprexa), and diagnosed him with benzodiazapine dependence and antisocial personality disorder. (Tr. 410-11). Plaintiff's GAF score was 60. (Tr. 411).

Lloyd Irwin Moore, Ph.D., performed a psychiatric evaluation of plaintiff on December 10, 2001. (Tr. 99-104). Dr. Moore diagnosed plaintiff with dysthymic disorder, psychotic disorder NOS, cannabis abuse, and panic disorder with agoraphobia. (Tr. 103). Dr. Moore assigned plaintiff a GAF score of 45. (Tr. 103). Dr. Moore noted that plaintiff reported having psychological problems since 1993, including anxiety, phobias, panic attacks, and auditory hallucinations. (Tr. 101). Dr. Moore reported that plaintiff was behaviorally "oriented in all spheres" and cooperative, and could provide basic information about current

---

which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder." DSM-IV-TR at 343.

5

events. (Tr. 103). Dr. Moore concluded that plaintiff was able to perform all activities of daily living, though his panic disorder interfered with some activities. (Tr. 103). Plaintiff had a "very poor history of social interaction with others" and did not currently engage in social activity outside of the house. (Tr. 104).

On December 27, 2001, Sherry Bassi, Ph.D., performed a mental residual functional capacity assessment of plaintiff. (Tr. 81-98). Dr. Bassi found that plaintiff had marked difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 95). Dr. Bassi diagnosed plaintiff with personality disorder NOS with antisocial traits and assigned him a GAF score of 45. (Tr. 98).

On December 29, 2001, Dr. Ahmad diagnosed plaintiff with benzodiazapine dependence, panic attacks, and antisocial personality disorder. (Tr. 405). Plaintiff's GAF score was 65. (Tr. 405).

On April 4, 2002, Dr. Ahmad continued plaintiff's diagnoses of anxiety disorder and panic disorder, and stated plaintiff was reporting trouble sleeping. (Tr. 404). Plaintiff's GAF score was 65. (Tr. 404). Several weeks later, on April 29, Dr. Ahmad diagnosed plaintiff with generalized anxiety disorder, dysthymia, and recommended that he undergo tests to rule out coronary artery disease. (Tr. 403). On April 19, 2002, plaintiff was having breathing trouble and received a prescription for asthma inhalers. (Tr. 386).

Loreta Mendoza, M.D., conducted a medical examination of plaintiff on April 2, 2002. (Tr. 74-77). She noted that plaintiff was hospitalized in January 2001 with a gunshot wound to the head that just grazed the scalp. (Tr. 74). He reported knee pain and moderate trouble walking following a beating incident during a carjacking several years prior, and noted that he had a bicycle accident a month prior to the examination date that further aggravated his knee pain. (Tr. 74). Plaintiff stated that he was not under the regular care of a cardiologist, and he had had asthma since childhood. (Tr. 74). Dr. Mendoza observed that plaintiff did not wheeze when breathing, had a full range of motion in his back, was mildly overweight, and walked with slight limp because he did not want to put his full weight on his right knee. (Tr. 76).

On August 20, 2002, Dr. Ahmad found that plaintiff's GAF score was 60 and diagnosed him with generalized anxiety disorder and dysthymia. (Tr. 402). An assessment by Dr. Ahmad on September 24, 2002 found that plaintiff had mild symptoms of anxiety, depressed mood, emotional withdrawal, tension, hallucinatory behavior, and sleep disturbance. (Tr. 401). His GAF score was 75.[8] (Tr. 401). Dr. Ahmad diagnosed plaintiff with dysthymic disorder, generalized anxiety disorder, and mixed personality disorder. (Tr. 401).

---

[8] A GAF score in the 71-80 range indicates: "If symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV-TR at 34.

On October 23, 2002, Dr. Ahmad found that plaintiff's GAF score was 65, and he suffered from personality disorder and was dysthymic. (Tr. 398). On December 3, 2002, Dr. Ahmad found that plaintiff had moderate symptoms of somatic concerns, anxiety, tension, depressed mood, hallucinatory behavior, motor retardation, and uncooperativeness. (Tr. 397). Plaintiff complained of chest pain. (Tr. 397). On February 13, 2003, the plaintiff visited Dr. Laurence Perlstein complaining of chest pain, but x-rays did not reveal signs of heart disease. (Tr. 393).

In April and May 2003, Robert Rocco Cottone, Ph.D., conducted a mental residual functional capacity assessment of plaintiff. (Tr. 248). Dr. Cottone found that plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions. (Tr. 248). Plaintiff was moderately limited in his ability to: maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; and work in coordination or proximity to others without being distracted by them. (Tr. 248). Plaintiff was moderately limited in his ability to complete normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to act appropriately with the general public. (Tr. 248-49). Finally, plaintiff was moderately limited in his ability to accept instructions and respond appropriately to supervisors' criticisms; to get along with coworkers or peer without distracting them or exhibiting behavioral extremes; and to be aware of normal

hazards and take appropriate precautions, and to set realistic goals or make plans independently of others. (Tr. 248-49).

Dr. Cottone concluded that plaintiff should avoid work that involved intense or extensive interpersonal involvement, close coordination or communication with other workers or supervisors, public contact handling complaints or dissatisfied customers, and proximity to available controlled substances. (Tr. 250). Dr. Cottone found that plaintiff could understand, remember, carry out and persist at simple to moderately complex tasks; make simple to moderately complex work-related judgments; related adequately to coworkers and supervisors and adjust adequately to ordinary changes in work routine and setting. (Tr. 250).

On May 28, 2003, Elbert H. Cason, M.D., conducted a medical examination of plaintiff. (Tr. 344-50). Dr. Cason noted that plaintiff had a history of stab wound to the chest and heart surgery. (Tr. 344). He was taking medication for chest pain, sometimes got dizzy, and reported having heart palpitations frequently. (Tr. 344). Plaintiff also reported having carpal tunnel syndrome in his left wrist and hemerrhoids. (Tr. 344). Dr. Cason found no heart murmurs. (Tr. 345). Plaintiff had full range of motion in his back and had some tenderness in the lumbar area but no muscle spasm. (Tr. 345). Dr. Cason was not able to hear any wheezing when plaintiff breathed, and he noted that plaintiff breathed easily. (Tr. 345). Plaintiff could stand, but he could not squat because of his knee surgery four years prior. (Tr. 345-46).

On June 7, 2003, SSA disability examiner Joshua McAlister found that plaintiff retained the residual functional capacity for simple work, such as table worker, egg processor, and ink printer. (Tr. 204).

In monthly appointments between April and December of 2003, Dr. Ahmad did not change the earlier diagnoses of plaintiff and assigned him GAF scores of between 60 and 75. (Tr. 332-43). Dr. Ahmad saw plaintiff monthly throughout 2004, noting no changes in his diagnoses, and assigned him GAF scores between 55 and 65. (Tr. 320-32). In September 2004, Dr. Ahmad assessed plaintiff's GAF score at 65. (Tr. 322). His diagnoses were otherwise unchanged. (Tr. 322).

### IV. **ALJ's Decision**

Administrative Law Judge Craig Ellis presided at plaintiff's administrative hearing. The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Social Security Act on April 18, 2000, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since April 18, 2000.

3. The claimant has the following: a depressive disorder; a generalized anxiety disorder; a history of substance abuse; a history of a stab wound to the heart in 1990; carpal tunnel syndrome of the left wrist; bleeding hemorrhoids; and a history of back pain. The combination of these impairments is "severe" as defined in the Social Security Act. With regard to his mental impairments, the claimant has mild restrictions of activities of daily living; mild to moderate difficulties with social functioning; mild to moderate difficulties with concentration, persistence, and pace; and one or two episodes of decompensation of extended duration.

Nevertheless, he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints are not consistent with the medical evidence of record. Therefore, his allegations are credible only to the extent of the limitations found herein.

5. The claimant has the residual functional capacity to occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit 6 hours in an 8-hour workday; stand/walk 6 hours in an 8-hour workday; occasionally stoop and crouch; and push/pull consistent with his lifting limitations. He is limited to less than occasionally interacting with supervisors, co-workers, and the general public and cannot do work with strict production quotas. (20 CFR 404.1545 and 416.945)

6. The claimant is unable to perform his past relevant work.

7. The claimant is 42 years old, which is defined as a 'younger individual.' (20 CFR 404.1563 and 416.963)

8. The claimant completed the requirements for a general equivalency diploma (GED). (20 CFR 404.1564 and 416.964)

9. The claimant does not have any acquired work skills, which are transferable to the skilled or semiskilled work functions of other work. (20 CFR 404.1568 and 416.968)

10. In view of the claimant's vocational characteristics, if he could perform the full range of work at the light level. Medical Vocational Rule 202.20 would apply and would direct a finding of not disabled. Although the claimant has additional limitations which prevent the performance of the full range of light work, the vocational expert testified that such an individual could perform the following jobs: office cleaner (6,000 jobs in the State of Missouri); small product assembler (2,500 jobs in the State of Missouri); and hand packager (2,500 jobs in the State of Missouri).

11. Based on the framework of Medical Vocational Rule 202.20, and considering the testimony of the vocational expert, the claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 CFR 404.1520(g) and 416.920(g)

(Tr. 17-18).

## V. Discussion

To be eligible for Disability Insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2006). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (2006).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv., 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20

C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

2. the plaintiff's vocational factors;
3. the medical evidence;
4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;
5. third-party corroboration of the plaintiff's impairments; and
6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

### B. **Plaintiff's Allegations of Error**

Plaintiff raises as single claim of error. He asserts that the ALJ's finding of residual functional capacity is not supported by substantial evidence, because the ALJ did not determine plaintiff's residual functional capacity on the basis of medical evidence. Plaintiff asserts that the ALJ identified "almost no medical evidence" to show that plaintiff suffered from physical limitations, yet the ALJ limited plaintiff to the performance of light work, based on his exertional limitations.

A claimant's residual functional capacity (RFC) is what he can do despite his limitations. § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id. The claimant bears the burden to prove that his RFC precludes him from all work, including his past work. Young v. Apfel, 221 F.3d 1065, 1069 n 5 (8th Cir. 2000).

Residual functional capacity is a determination based on all the record evidence, not only the medical evidence. Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000). The record must include some medical evidence that supports the ALJ's residual functional capacity finding. Id. at 867.

An ALJ is required to develop the record fully and fairly, but an ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (citations omitted). See also Wheeler v. Apfel, 224 F.3d 891, 895 n 3 (8th Cir. 2000) ("That the ALJ did not attempt to describe the entirety of [claimant's] medical history does not support the [claimant's] argument that the ALJ disregarded certain aspects of the record.").

The ALJ found that the claimant had "a depressive disorder; a generalized anxiety disorder; a history of substance abuse; a history of a stab wound to the heart in 1990; carpal tunnel syndrome of the left wrist; bleeding hemorrhoids; and a history of back pain." (Tr. 11, 17). The ALJ discussed the opinions and treatment notes of plaintiff's treating physician, Dr. Ahmad; consultative examining physician Elbert H. Cason, M.D.; and consultative examining psychiatrist R. Rocco Cottone, Ph.D. (Tr. 12-14). Further, the ALJ specifically stated that he based the RFC finding on the entire record. (Tr. 17).

The Court finds that the ALJ's RFC finding is supported by the evidence. Plaintiff had reported to Dr. Mendoza that he had trouble walking as a result of a knee injury, and Dr. Cason found that plaintiff could not squat as a result of the knee injury. Plaintiff's medical records show he was diagnosed with asthma. The record reflects that plaintiff complained of chest pain and dizziness several times, although Dr. Perlstein and Dr. Cason found no cardiac problems upon examination. This evidence is consistent with the ALJ's finding that plaintiff retained the RFC to perform light work.

## VI. Conclusion

The ALJ's decision was not based on legal error, and there is substantial evidence in the record as a whole to support to conclusion that plaintiff was disabled.

Accordingly,

16

**IT IS HEREBY ORDERED** that the relief sought by plaintiff his complaint and his brief in support of the complaint is **denied.**

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 18th day of August, 2008.